IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TRAVIS J. GRIEST,                      : Civil No. 1:25-CV-710
                                       :
    Plaintiff,                         :
                                       :
       v.                             :
                                       : (Chief Magistrate Judge Bloom)
FRANK BISIGNANO,                       :
Commissioner of Social Security,[1]    :
                                       :
    Defendant.                         :

## MEMORANDUM OPINION

## I.    Introduction

Travis Griest filed an application under Title XVI of the Social Security Act for supplemental security income on September 30, 2019. Following a hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Griest was not disabled from the date of his application through April 30, 2021, the date of the ALJ's initial decision.[2] The decision was remanded by this court for further consideration by the

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Bisignano is substituted as the defendant in this suit.

[2] Tr. 31.

ALJ.[3]  Specifically, the ALJ was instructed to reconsider the record with respect to the plaintiff's ability to interact with others given his documented history of mental health impairments and criminal conduct.[4]

The ALJ held a second hearing on March 6, 2024, and issued a second unfavorable decision on March 25, 2024, denying Griest's application for benefits.[5]  Griest now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.  After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"[6] we conclude that substantial evidence supports the ALJ's findings in this case.  Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.   Statement of Facts and of the Case

Travis Griest filed for supplemental security income, alleging disability due to a hernia and stomach issues.[7]  Griest was 31 years old

---

[3] Tr. 1301-26; *Travis G. v. Kijakazi*, Civ. No. 1:22-CV-1015.
[4] *Id.*
[5] Tr. 1208-38, 1239-71.
[6] *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).
[7] Tr. 74.

at the time he filed his application, had a limited education, and had no past relevant work.[8]

The administrative record in this case reveals that Griest suffered from a host of mental health impairments[9] beginning when he was a child. Records from the Florida Civil Commitment Center ("FCCC") provided a summary of Griest's mental health history, including that he was in special classes in school with a designation of Severely Emotionally Disturbed.[10] He reported he was suspended multiple times and ultimately expelled after he brought a weapon to school.[11] Griest further reported a history of substance abuse since he was 15 years old.[12]

Regarding his criminal conduct, the FCCC summary indicated that Griest had committed his first sexual offense in 2004.[13] Several months after his release from prison, he violated his probation when he

---

[8] Tr. 1229.
[9] Because Griest's appeal focuses only on his mental health impairments, we will forego a discussion of the records of his physical impairments.
[10] Tr. 512.
[11] *Id.*
[12] *Id.*
[13] *Id.*

trespassed on school grounds to make contact with his victim's sister.[14] Additionally, in 2011, Griest incurred another probation violation when he made explicit sexual remarks to an 11-year-old girl.[15] While incarcerated in the Florida Department of Corrections ("DOC"), Griest incurred multiple disciplinary violations "involving antisocial/criminogenic behavior, aggression/violence, and 1 charge involving sexual misconduct."[16] When he was released from the DOC, Griest was sent to the FCCC in May of 2015 for further treatment.[17]

Griest's initial treatment plan at the FCCC indicated that he had "limited insight into his deviant sexual behaviors" and required psychotropic medications for his mental health impairments.[18] A psychiatric evaluation in August of 2015 indicated that Griest had previously been diagnosed with unspecific pedophilic disorder, alcohol abuse disorder, and antisocial personality disorder.[19] Upon his

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] Tr. 471.
[19] Tr. 820.

4

admission, Griest reported experiencing depression, and that he had a good response to taking Zoloft in the past.[20]  A mental status examination revealed a cooperative attitude, relaxed behavior, depressed mood, and fair insight.[21]  The facility provider prescribed him Zoloft.[22]

Notes from the FCCC indicate that in July, August, and September of 2015, Griest incurred institutional violations for possession of pornography and other prohibited items, as well as inappropriate contact with another resident.[23]  It was noted that Griest had been cautioned to disengage from contact with the other resident, which he ignored.[24] Thus, Griest was put on a Behavior Contract and ultimately placed in the Behavior Management Dormitory for his continued violations of the contract.[25]  Griest's psychiatric treatment notes throughout 2015 and into 2016 indicated poor to fair or limited insight and judgment and fair attention and concentration at times, but his mental status examinations

---

[20] *Id.*
[21] Tr. 821.
[22] Tr. 822.
[23] Tr. 371, 376, 384.
[24] Tr. 376.
[25] Tr. 384, 476.

were otherwise unremarkable, noting a euthymic mood, no memory issues, and logical thought processes.[26] Griest also participated in group therapy.[27]

Griest's 2016 psychiatric evaluation indicated that he was stable on his medications.[28] A mental status examination revealed a mildly depressed mood, a calm and cooperative attitude, logical thought processes, and fair insight and judgment.[29] The examiner noted Griest's motivation to work and help others as some of his assets and strengths.[30] Throughout 2016 and 2017, Griest's psychiatric treatment notes were largely similar to the previous year, indicating fair insight and judgment but otherwise unremarkable mental status findings.[31] An updated treatment plan from November of 2017 indicated that Griest incurred four behavioral management reports, had limited insight into his deviant sexual behaviors, struggled to maintain boundaries with other residents,

---

[26] Tr. 545-51.
[27] Tr. 386, 396, 398-400, 404, 406, 410-13, 418-22, 426-28, 433-36, 441-45, 449-50, 452-53, 457-59.
[28] Tr. 827.
[29] Tr. 825-26.
[30] Tr. 827.
[31] Tr. 553-83.

and demonstrated poor problem solving.[32]   Griest was discharged from FCCC in May of 2018, after a jury found that he no longer met the criteria to be designated a sexually violent predator.[33]

In September of 2018, Griest underwent a mental status evaluation with Christine Schuster, Psy.D.[34]   Dr. Schuster noted that Griest's hygiene and grooming were inadequate, and he was easily distracted during the evaluation.[35]  He reported that he stopped taking his Zoloft.[36] Griest and his mother recounted his criminal history and history of mental health impairments, including past suicide attempts and an involuntary commitment after he put his hand through a window.[37]  He also reported attending church, living with roommates, and an ability to take care of himself and perform household chores.[38]   Griest was

---

[32] Tr. 513.

[33] Tr. 854.

[34] Tr. 857-62.

[35] Tr. 858.

[36] *Id.*

[37] Tr. 859.  Dr. Schuster also noted that while discussing Griest's criminal history and conduct, both Griest and his mother minimized the offenses and underlying conduct and exhibited the "propensity to view [Griest] in a positive manner."  Tr. 860.

[38] *Id.*

unemployed and disclosed that he left his last employment after three weeks in July of 2018.[39]  He reported he worked as a dishwasher for six years while he was incarcerated.[40]

A mental status evaluation revealed limited attention and concentration, intact recent and remote memory, fair social skills, impaired judgment and insight, and borderline intellectual functioning.[41] His full-scale IQ was a 71.[42]  Dr. Schuster diagnosed him with borderline intellectual functioning, ADHD, antisocial personality disorder, and PTSD.[43]  She opined that Griest's impairments had a mild to moderate impact on his activities of daily living, vocational performance, and interpersonal interactions.[44]  Griest underwent another examination in October with Dr. David Carpenter, M.D., at which time it was noted his mood was good, behavior was appropriate, speech was clear, and he followed directions well.[45]  Dr. Carpenter opined that Griest was "more

---

[39] Tr. 860.
[40] *Id.*
[41] Tr. 860-61.
[42] Tr. 862.
[43] *Id.*
[44] *Id.*
[45] Tr. 865.

8

limited by his psychiatric history and learning impairment than any physical history or diagnosis."[46]

In January of 2020, Griest underwent another mental status evaluation with Dr. Sarah Springer, Psy.D.[47] Griest reported that he had worked as a dishwasher for 30 days in 2019 but was fired for not being able to meet the demands of the job.[48] He reported a learning disability but denied any symptoms of depression, anxiety or mania, and stated that he was only concerned about his inability to learn new things quickly.[49] On examination, he had fluent speech, coherent and goal directed thought processes, a euthymic mood, intact attention, concentration, and memory, fair insight and judgment, and borderline cognitive functioning.[50] He reported being able to perform household chores and personal care, but that he had difficulty managing his money.[51] Dr. Springer opined that Griest had moderate limitations in

---

[46] Tr. 866.
[47] Tr. 882-94.
[48] Tr. 884.
[49] Tr. 885.
[50] Tr. 885-86.
[51] Tr. 886.

his ability to make complex work-related decisions, moderate limitations in responding appropriately to usual work situations and changes in a routine work setting, and no concentration, adaptation, or management limitations or limitations in his interactions with others.[52]

Griest did not resume any sort of mental health treatment until March of 2020, when he presented to Dr. Uchenna Uzoukwu, M.D., requesting outpatient treatment.[53]   Griest reported overwhelming anxiety and requested Zoloft, as it had helped him in the past.[54] A mental status examination revealed an "all right" mood, cooperative behavior, fair attention and concentration, poor impulse control, and limited insight and judgment.[55] Dr. Uzoukwu prescribed Zoloft.[56] Griest treated with Dr. Uzoukwu monthly from March to August of 2020, during which treatment notes indicated Griest did well on his medications, reported no

---

[52] Tr. 888-89.
[53] Tr. 896.
[54] *Id.*
[55] Tr. 897.
[56] *Id.*

depression or anxiety symptoms or inappropriate sexual behavior, and his conditions remained stable.[57]

Griest's next treatment records are from June of 2022 with Dr. Andrew Newton, M.D., and indicate that Griest was experiencing anxiety and anger outbursts.[58] He had a dysthymic mood; his concentration, attention, memory, insight, and judgment were fair; his cognitive functions were grossly intact; and he denied any psychotic symptoms.[59] Dr. Newton continued his Zoloft and recommended he start individual psychotherapy.[60] In July, Griest continued to exhibit poor impulse control and anger.[61] Dr. Newton noted that Griest was tolerating his medications well, and he was a low risk of self-harm and no harm to others.[62] In August, Griest reported that he had an argument with his therapist, who closed his case.[63] Treatment notes from Griest's primary care physician, Dr. Matthew Kraynak, D.O., indicated that in September,

---

[57] Tr. 898, 907-12.
[58] Tr. 1513.
[59] Tr. 1514.
[60] *Id.*
[61] Tr. 1516.
[62] Tr. 1517.
[63] Tr. 1519.

Griest reported doing well on his medications and that his major depressive disorder and generalized anxiety disorder were stable.[64]

Griest began counseling at Recovery Counseling Services in January of 2023, at which time he reported struggling with symptoms of PTSD and severe depression.[65] On examination, Griest had fair eye contact, agitated motor behavior, normal speech, an anxious mood, intact memory, poor judgment, and fair insight and attention.[66] In April, Griest was placed back on Zoloft by his primary care provider and reported his anxiety and depression were better.[67] At a follow up appointment in June, Griest noted that he was having more physical issues, but that his sleep and mood were good.[68] Griest discontinued counseling in August after reporting that he was not sure where he would be living.[69]

From December 2023 to February 2024, Griest was incarcerated in the Northumberland County Prison after being charged with sexual

---

[64] Tr. 1676-77.
[65] Tr. 1523.
[66] Tr. 1530-31.
[67] Tr. 1535, 1807.
[68] Tr. 1537.
[69] Tr. 1538.

12

assault and harassment of his wife.[70]  At his intake examination, Griest exhibited good eye contact, pressured speech, normal mood and affect, normal thought content, impulsive judgment, limited insight into his situation and mental illness, and intact memory.[71]  Griest was placed on suicide watch on intake and received mental health treatment while incarcerated.[72]  Notes from Griest's mental health sick calls indicate that he was diagnosed with impulse control disorder, cluster B personality traits.[73]

It is against the backdrop of this record that an ALJ held a second hearing on Griest's disability application on March 6, 2024.[74]  Griest and a Vocational Expert ("VE") both appeared and testified at this hearing.[75] Following this hearing, on March 24, 2024, the ALJ issued a decision denying Griest's application for disability benefits.[76]  The ALJ first concluded that Griest had not engaged in substantial gainful activity

---

[70] Tr. 1845.
[71] Tr. 1847-48.
[72] Tr. 1850-80.
[73] Tr. 1914.
[74] Tr. 1239-71.
[75] *Id.*
[76] Tr. 1208-38

since September 30, 2019, the date of Griest's application.[77]  At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Griest suffered from the following severe mental health impairments: borderline intellectual functioning; learning disorder; attention deficit hyperactivity disorder ("ADHD"); bipolar disorder; major depressive disorder; generalized anxiety disorder; adjustment disorder with depressed mood; antisocial personality disorder with related psychopathy; pedophiliac disorder; post-traumatic stress disorder ("PTSD"); panic disorder; and impulse control disorder, cluster B personality traits.[78]  At Step 3, the ALJ concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations.[79]

Specifically, in considering the listings, the ALJ found that Griest suffered from a marked limitation in interacting with others, and moderate limitations in the remaining paragraph "B" criteria— understanding, remembering, and applying information; concentrating,

---

[77] Tr. 1213.

[78] Tr. 1214.

[79] Tr. 1215-20.

persisting, and maintaining pace; and adapting or managing oneself.[80]

Regarding his limitations in interacting with others, the ALJ considered evidence of Griest's prior incarcerations, criminal history and related conduct, prior educational and behavioral difficulties, and more recent mental health treatment.[81]  The ALJ also considered Griest's testimony, as well as the consulting and examining physicians' opinions regarding Griest's abilities in this area, which all found, at most, a moderate limitation in this area of functioning.[82]

Between Steps 3 and 4, the ALJ then concluded that Griest:

[H]a[d] the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) with the following limitations: [ . . .] he is limited to occupations that require the claimant to understand, remember, and carry out simple instructions, and make simple work-related decisions. Additionally, he is limited to occupations that require the claimant to deal with occasional changes in a routine work setting. Also, he is limited to occupations which require no interaction with members of the general public. Further, after an initial training period to learn the job, the claimant is limited to occupations which require no more than occasional interaction with supervisors and coworkers. Lastly, he is limited to occupations which require no prolonged reading for content and comprehension, or complex mathematical

---

[80] *Id.*

[81] Tr. 1217.

[82] *Id.*

15

calculations such as cashier or teller work.[83]

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Griest's reported symptoms. With respect to the medical opinion evidence, the ALJ considered the opinions of the state agency consultants, Drs. Gold and Cannon, and found them partially persuasive.[84] These providers found moderate limitations in the areas of mental functioning, which the ALJ found was generally supported by the longitudinal record.[85] However, to account for Griest's records of anger, impulse control, mood swings, and his criminal history, the ALJ found a marked limitation in interacting with others and included limitations to no interactions with the public and only occasional interactions with supervisors and coworkers.[86]

The ALJ also considered Dr. Springer's January 2020 opinion and found it partially persuasive.[87] The ALJ noted that Springer's mild to

---

[83] Tr. 1220-21.
[84] Tr. 1227-28.
[85] Tr. 1227.
[86] Tr. 1227-28.
[87] Tr. 1228.

moderate findings were mostly consistent with the record, but that the record supported additional limitations in the claimant's ability to interact with others.[88]  She reached a similar conclusion with respect to Dr. Schuster's September 2018 opinion, finding it partially persuasive and noting that the moderate limitations were mostly consistent with the record but accounting for additional limitations in interpersonal interactions.[89]  Finally, the ALJ found Dr. Carpenter's October 2018 opinion that Griest was limited due to his learning disability and psychiatric history not persuasive, as she reasoned Dr. Carpenter did not examine any psychiatric records and based this opinion solely on Griest's subjective complaints.[90]

With respect to Griest's symptoms, the ALJ found that Griest's statements concerning the intensity, persistence, and limiting effects of his impairments were not entirely consistent with the medical evidence.[91] At Griest's first hearing, he testified that he left his last employment as

---

[88] *Id.*
[89] Tr. 1228-29.
[90] Tr. 1226.
[91] Tr. 1222.

a dishwasher in 2019 because he could not understand what people were telling him to do.[92]  However, he reported working as a dishwasher while incarcerated with no issues.[93]  At the second hearing, when asked why he could not work, Griest stated: "it's not that I can't interact with others; it's just I won't understand what anybody's asking me or wanting me to do."[94]  He reported difficulties concentrating, staying focused, and understanding, and stated that he believed he had the functionality of a 10-year-old.[95]

The ALJ ultimately found Griest's testimony to be inconsistent with the objective clinical findings.[96]  The ALJ recounted the objective medical evidence, including normal and abnormal mental status findings, Griest's periods of incarceration and the conduct underlying his criminal history, and the medical examinations in the record.[97]  She also considered Griest's activities of daily living, which included his ability to

---

[92] Tr. 51-52.
[93] Tr. 52-53.
[94] Tr. 1256.
[95] Tr. 1258, 1260.
[96] Tr. 1222-26.
[97] Tr. 1223-26.

18

perform personal care, household chores, shop in stores, read, and manage social media.[98]   Ultimately, while the ALJ acknowledged that Griest had some limitations performing these activities, she concluded that Griest was not as limited as he alleged.[99]

Having made these findings, the ALJ found at Step 4 that Griest had no past relevant work but found at Step 5 that he could perform the occupations of a floor waxer and hand packager.[100]   Accordingly, the ALJ found that Griest had not met the stringent standard prescribed for disability benefits and denied his claim.[101]

This appeal followed.   On appeal, Griest argues that the ALJ's decision is not supported by substantial evidence because she failed to find Griest *per se* disabled at Step 3, insisting that he meets Listing 12.08.   This case is fully briefed and is therefore ripe for resolution.   For the reasons set forth below, we will affirm the decision of the Commissioner.

---

[98] Tr. 1225-26.
[99] Tr. 1226.
[100] Tr. 1229-30.
[101] Tr. 1231.

19

## III.   Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.[102] Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[103]    Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla.[104]

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence."[105]   However, where there has been an adequately developed

---

[102] *See* 42 U.S.C. §405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

[103] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

[104] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

[105] *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted).

20

factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."[106] The court must "scrutinize the record as a whole" to determine if the decision is supported by substantial evidence.[107]

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[108] Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations."[109] Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is

---

[106] *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

[107] *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

[108] *Biestek*, 139 S. Ct. at 1154 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[109] *Id.*

supported by substantial evidence and was based upon a correct application of the law.[110]

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder."[111] Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision.[112] This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more

---

[110] *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

[111] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).

[112] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).

than just conclusory statements.[113]  Ultimately, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."[114]

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."[115]  This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy."[116]   To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement

---

[113] *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted).

[114] *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

[115] 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a).

[116] 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).

age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured.[117]

In making this determination, the ALJ follows a five-step evaluation.[118]  The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").[119]

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[120]  In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her

---

[117] 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

[118] 20 C.F.R. §§404.1520(a), 416.920(a).

[119] 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

[120] *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1).

analysis.[121]  Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by substantial evidence.[122]

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work.[123]  If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience.[124]

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination.  While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, other courts have taken the approach that "[t]here is no legal requirement that a physician

---

[121] 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

[122] *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

[123] *Mason*, 994 F.2d at 1064.

[124] 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

have made the particular findings that an ALJ adopts in the course of determining an RFC."[125]    Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided."[126]

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision.    Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence.[127] These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination.  On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have

---

[125] *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006); *see also Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013).

[126] *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

[127] *Biller*, 962 F. Supp. 2d at 778–79.

routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence.[128]    Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence.[129]

C. <u>Standards Governing Step 3 of the Sequential Analysis</u>

At Step 3 of this sequential analysis, the ALJ is required to determine whether a claimant's impairments or combination of impairments are so severe that they are *per se* disabling, entitling the claimant to benefits.  As part of this analysis, the ALJ must determine whether a claimant's alleged impairment is equivalent to one or more listed impairments, commonly referred to as listings, that are acknowledged to be so severe as to preclude the claimant from working.[130]

Thus, if a claimant's impairment meets or equals one of the listed impairments, the claimant is considered *per se* disabled and is awarded

---

[128] *See Titterington*, 174 F. App'x 6; *Cummings,* 129 F. Supp. 3d at 214–15.

[129] *Burns,* 312 F.3d 113.

[130] 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1; *Burnett,* 220 F.3d 112, 119.

benefits.[131]    The claimant bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment."[132]   An impairment that meets or equals only some of the criteria for a listed impairment will not be sufficient.[133]

This Step 3 determination is a medical determination.  Accordingly, the claimant must present medical evidence or a medical opinion showing that his or her impairment meets or equals a listing.  However, the ALJ is not required to accept a physician's opinion if the opinion is not supported by objective medical evidence.[134]   The ALJ is responsible for identifying the relevant listed impairments, given that it is it is "the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."[135]

---

[131] 20 C.F.R. § 416.920(d); *Burnett*, 220 F.3d at 119.

[132] *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citing 20 C.F.R. §416.920(d); SSR 83-19 at 91).

[133] *Id.*

[134] *See Schwartz v. Halter*, 134 F. Supp. 2d 640, 659 (E.D. Pa. 2001).

[135] *Burnett*, 220 F.3d at 120 n.2.

### D. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[136] Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Griest contends that the ALJ should have found him disabled at Step 3 because he meets Listing 12.08. Listing 12.08 requires that a claimant provide evidence of both "A" and "B" criteria as follows:

12.08 Personality and impulse-control disorders (see 12.00B7) satisfied by A and B:

A. Medical documentation of a pervasive pattern of one or more of the following:

1. Distrust and suspiciousness of others;
2. Detachment from social relationships;
3. Disregard for and violation of the rights of others;
4. Instability of interpersonal relationships;
5. Excessive emotionality and attention seeking;
6. Feelings of inadequacy;

---

[136] *Biestek*, 139 S. Ct. at 1154.

7. Excessive need to be taken care of;
8. Preoccupation with perfectionism and orderliness; or
9. Recurrent, impulsive, aggressive behavioral outbursts.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).
2. Interact with others (see 12.00E2).
3. Concentrate, persist, or maintain pace (see 12.00E3).
4. Adapt or manage oneself (see 12.00E4).[137]

Here, Griest contends that he meets the listing because his medical records establish several of the paragraph "A" criteria, including feelings of inadequacy, excessive need to be taken care of, and recurrent, impulsive, aggressive behavioral outbursts.[138]  But Griest does no more than summarize his history of mental health treatment to include several hospitalizations and treatment for impulse control disorder while incarcerated.[139]  Griest does not point to any specific medical records that establish one or more of the paragraph "A" criteria for the listing.  But as

---

[137] 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.08.
[138] Doc. 11 at 8-9.
[139] *Id.*

30

we will explain below, even if the record evidence established the "A" criteria, Griest fails to show that he meets the "B" criteria, and therefore, satisfies the listing.

Griest contends that the medical evidence establishes an extreme limitation in interacting with others, which would satisfy the listing's "B" criteria.[140] He argues in a conclusory fashion that his inability to interact with others was "the basis of his incarceration" and thus, establishes an extreme limitation.[141]  Additionally, Griest appears to argue that the medical opinion evidence establishes such a limitation.[142]  But none of the medical opinions of record found such extreme limitations.  In fact, the medical opinions found, at most, a moderate limitation in Griest's ability to interact with others.[143]  These medical opinions considered

---

[140] Doc. 11 at 9-10.

[141] *Id.* at 9.

[142] *Id.* at 10-12.

[143] *See* Tr. 78-83, 93-99, 862, 888-89.  We note that Griest summarily argues these opinions and the medical evidence establish extreme limitations in other areas of functioning. Doc. 11 at 12.  However, this argument appears undeveloped.  Moreover, it is clear that these opinions, which found moderate limitations in the areas of mental functioning, do not support extreme limitations in these areas, and Griest provides no evidence to establish otherwise.

31

Griest's history of incarceration and mental health treatment.[144] Moreover, the ALJ noted Griest's testimony and function report, which indicated that he had gotten along with his employer when he worked, and that he had no problem interacting with others.[145]

The ALJ, in considering Griest's criminal history and history of mental health impairments, accounted for greater limitations in this area than the medical opinions, as she limited Griest to no interaction with the public and only occasional interaction with supervisors and coworkers to account for a marked limitation in this area.[146] The ALJ adequately explained her reasoning for such a limitation, and further, for her determination that Griest did not meet a listing. Accordingly, we find no error with the ALJ's Step 3 determination.

Given that the ALJ considered all the evidence and adequately explained the decision for including or discounting certain limitations as established by the evidence, we find no error with the decision. Therefore, under the deferential standard of review that applies to

---

[144] *Id.*

[145] Tr. 1221-22, 1225.

[146] Tr. 1217, 1227-29.

appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision will be affirmed.

## IV.   Conclusion

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

Submitted this 4th day of March 2026.

*s/ Daryl F. Bloom*
Daryl F. Bloom
Chief United States Magistrate Judge